UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:15CV-00641-JHM

JASON GAINES                                                                                          PLAINTIFF

V.

GENERAL ELECTRIC COMPANY and
CHERRIE WEBB, individually                                                                DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on motions by Defendants, General Electric Company and Cherrie Webb, for summary judgment [DN 40, DN 41]. Fully briefed, this matter is ripe for decision.

**I. STANDARD OF REVIEW**

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show that there is some "metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-

moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252. It is against this standard the Court reviews the following facts.

## II. BACKGROUND

Plaintiff Jason Gaines, an African-American, began working for Defendant, General Electric Company ("GE"), in June of 2012. During the relevant time period, Gaines was employed as a replacement operator in the old wire rack department in GE's Appliance Park Building Three on an assembly line making baskets that go into dishwashers. As a replacement operator, Gaines is responsible for filling in on the assembly line when another employee is absent or needs to leave the line to use the restroom or for other reasons. Gaines is still employed by GE and currently works as a building replacement operator.

GE maintains a Fair Employment Practices Policy which instructs employees "[n]ot [to] engage in harassing or bullying behavior, including behavior that is directed at a person because of his or her race, religion, sex, etc." (GE Fair Employment Practices Policy at 1.) Employees are required to "[p]romptly raise any concerns about a violation or possible violation of this policy." Id. The policy provides that employees who violate the spirit or letter of GE's policies are "subject to disciplinary action up to and including termination of employment." Id. In addition to the Fair Employment Practices Policy, GE also established additional rules in the Appliance Park Rules of Conduct which specifically list "[t]hreatening, intimidating, coercing or interfering with employees, supervision or Plant Security personnel, including harassing

employees on account of their race, sex or disability" as a "serious offense" that "will result in time-off and if considered serious enough in the judgment of management, could also result in discharge on the first offense." (Appliance Park Rules of Conduct at 3.)

Gaines alleges that between March of 2014 and October of 2014, he was subjected to a racially hostile work environment by two female Caucasian co-workers at GE, Cherrie Webb and Ali Day.

**A. Cherrie Webb**

Gaines testified that on two occasions in 2014, he heard co-worker Cherrie Webb use a racial slur directed at him. First, Gaines testified that, as a replacement operator, he attempted to repair a machine on the line on which Webb was working. Gaines testified that Webb became frustrated with the machine and said: "This fucking machine. This shit is getting on my nerves. I got to get the fuck away from here." (Gaines Dep. at 293.) According to Gaines, Webb then threw up her hands and said, "Niggers always get in my way." (Gaines Dep. at 285, 292-294.) Gaines testified that he told the line supervisor, Beth D'Annunzio about the comment. D'Annunzio advised Gaines that she would speak with Human Resources Manager Kenny Yeager. (Gaines Dep. at 294.) Around the same time period, Gaines testified that Webb was sitting in a chair on the line about 12 to 15 feet from him, mumbling some stuff that Gaines did not hear, and then said, "Sometimes I just want to go get a shotgun and come in here and blow a nigger's head off." (Gaines Dep. at 298.) Gaines testified that he believed her and took it as a very real threat. (Id. at 304.) Gaines reported the incident to his supervisor. Gaines also testified that Webb would also use the racial epithet when talking about her daughter's physically abusive boyfriend, who was African-American. (Gaines Dep. at 288-289.)

3

Supervisor Beth D'Annunzio advised Kenny Yeager, GE Human Resource Manager, of Gaines' report concerning Webb. Yeager began an investigation of the matter. Yeager interviewed Gaines, other department employees, and Webb. When interviewed, Webb denied using the racial epithet in reference to Gaines, but admitted to using the term in reference to her daughter's abusive boyfriend. (Yeager Dep. at 26.) At the conclusion of the investigation, GE disciplined Webb for violating GE's Rules of Conduct prohibiting harassing conduct on the basis of race. (Cherrie Webb Code of Conduct Warning May 21, 2014.) The warning states that Webb's behavior was "very inappropriate and will not be tolerated." Webb received a written warning and four-week suspension. She was also advised that future violations would result in further disciplinary action up to and including termination. Webb's union representative filed a grievance and sought to reduce the length of Webb's discipline. GE negotiated with union representatives and agreed to reduce Webb's suspension to one week. (May 29, 2014 Agreement.)

Three months after Webb's suspension, Webb again used the "n-word" in recounting to another employee her earlier violation and disciplinary action. Gaines testified that he learned from a co-worker that Webb had told another employee, Kyle Liburd, that Gaines would not help her on the job because he was "mad at her" for reportedly calling Gaines a "nigger." (Gaines Dep. at 216-317.)[1] Upon learning of the incident, Yeager conducted an investigation, interviewed Kyle Liburd; Jim Spencer, the employee who had reported the incident to Gaines; another employee; and Webb. As a result of the investigation, GE advised Webb that her employment would be terminated for this second Code of Conduct violation. Once again, the union filed a grievance on Webb's behalf, and after negotiations, GE agreed to a four-week

---

[1] Gaines also states that he became aware that Webb advised Angel Burrell, another GE employee, in reference to Gaines, "[t]hat nigger's always late." (Gaines Dep. at 309.)

4

suspension without pay, a mandatory referral to the employee assistance program; mandatory transfer to a different department; and a Last Chance Agreement providing that future violations of the Rules of Conduct within the next 36 months would be grounds for immediate termination. (Webb Last Chance Agreement, September 29, 2014.)

### B. Ali Day

Gaines testified that a dispute between Day and Gaines arose when he felt that Day was directing his work and telling him what to do. Day reported to GE Human Resources that Gaines had "yelled and screamed" at her, gotten in her personal space and yelled at her, and was "slinging coffee" while yelling at her. Day reported feeling threatened and intimidated by him. (Gaines Dep. at 169-177.) Gaines testified that one time when he and Day were arguing about her giving him direction, Day told him that she was afraid of him because he is "a big black guy." (Gaines Dep. at 190.) Gaines testified that Day also told him that "she felt like black guys were aggressive, that we don't do nothing but do drugs and fight and want to kill each other." (Gaines Dep. at 185.) Day later told Gaines she was joking or playing. (Id. at 190.) Gaines also alleges that on one other occasion, Day used a racial epithet during a disagreement. Gaines testified that Day almost hit Gaines with a forklift and yelled, "[i]f you get your nigger ass out of the way, you wouldn't have to worry about it." (Gaines Dep. at 171.) Gaines testified that she returned and apologized, and he accepted her apology. Gaines reported the incident to the line supervisor.

The record reflects that GE investigated both Day and Gaines' complaints about each other's conduct. Day received a Code of Conduct Warning, which is a formal disciplinary action, in which she was directed to "avoid any and all references to race" and to "do everything possible to make sure that you get along" with co-workers. (Ali Day Code of Conduct Warning,

5

May 22, 2014.) As a result of Gaines' conduct, Gaines received a "record card," the equivalent of verbal coaching or counseling, and was told that he should get along with co-workers and avoid confrontation. (Gaines record card notation, May 22, 2014). Gaines testified that since 2014, he and Day have been able to work together and he has had no further problem or incident with Day over the last two years of his employment. (Gaines Dep. at 191-192.)

Gaines filed a charge of discrimination with the EEOC on December 5, 2014, alleging race discrimination as a result of Webb's and Day's remarks and retaliation. The EEOC dismissed the charge and issued its Right to Sue letter on June 9, 2015.

On July 21, 2015, Gaines and co-worker Beth Beedy were observed outside of the building by Rob Willy, the Manufacturing Transition Leader, smoking cigarettes during work hours in a restricted area that contained barrels of oil and flammable material. Willy approached both Gaines and Beedy, informed them of GE's smoke-free campus policy, and advised them that he would contact their supervisors. Gaines denies that he was smoking at the time. Following an investigation, both Gaines and Beedy were issued Code of Conduct warnings and a four week disciplinary suspension without pay. (Gaines July 23, 2015 Code of Conduct Warning; Beth Beedy July 23, 2015 Code of Conduct Warning). The union filed a grievance on behalf of both Gaines and Beedy and negotiated the four-week suspensions down to a one-week suspension each. Beedy agreed to the reduced suspension, but Gaines rejected the reduced suspension. Gaines filed suit on July 29, 2015.

### III. DISCUSSION

The Plaintiff has alleged claims against Defendant, General Electric Company, under both Title VII and the Kentucky Civil Rights Act. Under the Kentucky Civil Rights Act ("KCRA"), it is unlawful for an employer "[t]o fail or refuse to hire, or to discharge any

6

individual, or otherwise to discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, national origin[.]" KRS § 344.040(1)(a). "Racial discrimination claims filed pursuant to Ky. Rev. Stat. § 344.040(1) are analyzed under the standards applied to federal racial discrimination claims brought pursuant to Title VII of the Civil Rights Act of 1964." Scott v. G & J Pepsi–Cola Bottlers, Inc., 391 Fed. Appx. 475, 477 (6th Cir. 2010). Therefore, the hostile work environment and retaliation claims alleged by Plaintiff will be analyzed under Title VII. Plaintiff has also alleged a claim for Intentional Infliction of Emotional Distress against Defendant, Cherrie Webb.

### A. Hostile Work Environment

GE argues that summary judgment on Gaines' hostile work environment claim is warranted because Gaines cannot establish that he was subjected to severe or pervasive harassment based on his race or that such conduct was sufficiently offensive to alter his work performance in any way. GE further maintains that Gaines cannot establish a basis for employer liability because GE took prompt corrective action calculated to prevent further harassment.

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may establish a Title VII violation by proving that the discrimination based on race created a hostile work environment. Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993); Hafford v. Seidner, 183 F.3d 506, 512 (6th Cir. 1999) (amended opinion). To establish a *prima facie* case of Title VII harassment, Plaintiff must prove that: (1) he was a member of a protected class; (2) he was subjected to unwelcomed harassment; (3) the harassment was based on race; (4) the harassment created a hostile work environment; and (5) the existence of employer liability.

Russell v. University of Toledo, 537 F.3d 596, 608 (6th Cir. 2008); Hafford, 183 F.3d at 512. See also Lewis-Smith v. Western Kentucky Univ., 85 F. Supp. 3d 885, 902 (W.D. Ky. 2015), aff'd (Jan. 12, 2016). Harassment creates a hostile work environment when, based upon a totality of the circumstances, "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (citation omitted); Williams v. General Motors Corp., 187 F.3d 553, 560 (6th Cir. 1999).

GE does not contest the first three requirements of the *prima facie* case. The parties dispute whether the harassment created a hostile work environment under the law and whether the employer is liable. For purposes of GE's motion for summary judgment, the Court will assume that Gaines has met the fourth requirement of the *prima facie* case. Thus, the issue the Court will address is whether the employer is liable for the hostile work environment. See Smith v. Rock-Tenn Servs., Inc., 813 F.3d 298, 311 (6th Cir. 2016).

An employer is liable for co-worker harassment "if it knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action.'" Harris v. Sodders, 2009 WL 331633, *2 (6th Cir. Feb. 11, 2009)(citing Clark v. United Parcel Serv., Inc., 400 F.3d 341, 348 (6th Cir. 2005)); Gallagher v. C.H. Robinson Worldwide, Inc., 567 F.3d 263, 276 (6th Cir. 2009); Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009). If the employer responded to an employee's complaint of co-worker harassment, the employer will be liable only "if its response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." McCombs v. Meijer, Inc., 395 F.3d 346, 353 (6th Cir. 2005). "Generally, a response is adequate if it is reasonably calculated to end the harassment." Waldo v. Consumers Energy Co., 726 F.3d 802, 814 (6th Cir. 2013). "Steps that would

'establish a base level of reasonably appropriate corrective action' may include promptly initiating an investigation to determine the factual basis for the complaint, 'speaking with the specific individuals identified by [the complainant], following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management.'" Waldo, 726 F.3d at 814 (quoting West v. Tyson Foods, Inc., 374 Fed. Appx. 624, 633 (6th Cir. 2010)).

In the present case, Human Resource Manager Yeager testified that he received a complaint that Ali Day and Cherrie Webb were using racial epithets at work in April 2014 from Gaines' manager, Beth D'Annunzio, and took prompt and appropriate remedial action. With respect to Webb, Yeager interviewed Gaines on April 8, 2014 as part of the investigation. Yeager also interviewed other department employees to inquire about Gaines' report who informed Yeager that Webb had asked them if they had accused her of calling Gaines the "n-word." (Yeager Dep. at 22-25.) Yeager also interviewed Webb who denied using the "n-word" in reference to Gaines, but admitted to using the term in reference to her daughter's abusive boyfriend. (Id. at 26.) At the conclusion of the investigation, GE disciplined Webb for violating GE's Rules of Conduct prohibiting harassing conduct on the basis of race. Webb received a written warning and a four-week suspension. Yeager testified that the disciplinary action was calculated to prevent future recurrences by Webb. (Id. at 63.) Subsequently, the Union filed a grievance and Webb's suspension was reduced to a week.

Three months after Webb's suspension, Yeager learned that Webb once again used the "n-word" in recounting to another employee her earlier violation and disciplinary action. Yeager initiated another investigation, interviewing Gaines, Kyle Liburd (the employee to whom Webb made the remark), Jim Spencer (who informed Gaines of the incident), another employee, and

9

Webb. As a result of the investigation, GE terminated Webb. The Union filed a grievance on Webb's behalf. After negotiations, GE agreed to a four-week suspension without pay, mandatory referral to the employee assistance program, mandatory transfer to a different department, and a Last Chance Agreement that provided future violations of the Rule of Conduct within 36 months would be grounds for immediate termination.

With respect to Day, Yeager testified that he also investigated Gaines' complaint against Day and issued Day a Code of Conduct Warning in which she was directed to "avoid any and all reference to race" and to "do everything possible to make sure that you get along" with co-workers. Gaines confirmed that since 2014, he and Day have worked together and have had no further problems. (Gaines Dep. 191-192.)

On this record, GE took prompt and appropriate corrective action in response to Gaines' reports to GE of the racial incidents. In both instances, GE promptly conducted an investigation of the alleged harassment resulting in the discipline of two employees. See Collette v. Stein-Mart, Inc., 126 Fed. Appx. 678, 686 (6th Cir. 2005) ("The most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified."). Accordingly, GE's response cannot be described as indifferent or unreasonable.

Similarly, GE did not act unreasonably by not disciplining Webb for alleged comments made to other co-workers about Gaines in the summer of 2014. Nothing suggests that during the time period between Webb's first disciplinary action and her September 2, 2014, termination, GE was on notice of racial slurs directed at or heard by other employees referencing Gaines. Furthermore, GE did not act unreasonably by failing to investigate alleged conduct by union stewards or members. In his response to the motion for summary judgment, Gaines implies that

10

the conduct of certain union members created a racially hostile work environment. Specifically, Gaines cites: (1) union steward Susan Logan's use of a racial slur during union meeting; (2) a union steward's investigation into a report by union member Jacora Bullet, an African-American female, that she had been sexually harassed by Gaines via off-work-hours text messages; and (3) Gaines' complaints to fellow union members about Webb's alleged comments. "An employer has a duty to take prompt and appropriate remedial action in response to complaints of racial harassment, see Barrett, 556 F.3d at 516 (citation omitted), and this duty presupposes that the employer is given enough information to take such action." Davis v. Landscape Forms, Inc., 640 Fed. Appx. 445, 452 (6th Cir. 2016). In this case, Gaines has submitted no evidence to establish that GE knew or should have known of this alleged conduct. The record does not reflect that Gaines reported any of this information, including Logan's use of a racial slur, to GE managerial staff. This was not a situation where the employer was aware of these allegations of harassment "but undertook no formal investigation or failed to interview any witnesses at all 'to determine whether the complaints were valid or who was responsible for the mistreatment.'" Williams v. E. I. Du Pont De Nemours & Co., Inc., 2016 WL 5416538, *14 (W.D. Tenn. Sept. 28, 2016)(quoting Waldo v. Consumers Energy Co., 726 F.3d 802, 817 (6th Cir. 2013) (employer failed to undertake formal investigation, interview the complaining employees coworkers, identify who was responsible for the mistreatment, or report internal complaints to upper management); Jackson v. Quanex Corp., 191 F.3d 647, 663–64 (6th Cir. 1999)(holding that when the employer knew about complaints but made no effort to discover the perpetrators of harassment, the employer's response was not reasonably calculated to end the harassment).

    For these reasons, the Court finds that Plaintiff has produced no evidence from which a reasonable juror could find that GE's efforts "manifest[ed] indifference or unreasonableness

11

under the circumstances." Williams, 2016 WL 5416538, *14. Therefore, Defendant's motion for summary judgment is GRANTED as to Plaintiff's co-worker hostile work environment claim under Title VII and KCRA.

### B. Retaliation

GE maintains that Gaines' retaliation claim must also fail as a matter of law. GE argues that Gaines cannot establish that his suspension for smoking on the premises while on the clock was causally connected to any protected activity, particularly when another employee who never engaged in any protected activity received identical discipline.

To make out a claim of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. Scott v. Metropolitan Health Corp., 234 Fed. Appx. 341, 346 (6th Cir. 2007); Morris v. Oldham County Fiscal Court, 201 F.3d 784, 792 (6th Cir. 2000). If and when a plaintiff has established a *prima facie* case, the burden of production once again shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). If the employer carries that burden, the plaintiff bears the burden of demonstrating that the employer's reason is pretextual. Id. GE maintains that Gaines has not raised a genuine issue of material fact as to his *prima facie* case or as to pretext.

### *Prima Facie* Case

For the purpose of this motion for summary judgment, GE assumes that Gaines is able to establish the first three elements of a *prima facie* case of retaliation. However, GE argues that Gaines has offered no evidence of a causal connection between the alleged protected activity and

12

GE's decision to suspend Gaines. To establish a causal connection, the plaintiff must "proffer evidence sufficient to raise the inference that [his] protected activity was the likely reason for the adverse action." E.E.O.C. v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997) (citation omitted). "In determining whether there is a causal relationship between a plaintiff's protected activity and an allegedly retaliatory act, courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." Barrett v. Whirlpool Corp., 556 F.3d 502, 516–517 (6th Cir. 2009). While it is true that temporal proximity alone is usually insufficient to establish a causal connection for a retaliation claim, the causal connection element is satisfied "where the adverse employment action occurred within a matter of months, or less, of the protected activity." Dixon v. Gonzales, 481 F.3d 324, 334 (6th Cir. 2007). See also Goller v. Ohio Dept. of Rehabilitation and Correction, 285 Fed. Appx. 250, 257 (6th Cir. 2008); Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004)(three-month period between the protected activity and employee's termination is sufficient to create a causal connection for the purposes of establishing a *prima facie* case). However, "where some time has elapsed between when the employer learns of the protected activity and the adverse employment action, the employee must produce other evidence, in addition to the temporal proximity, in order to establish causation." Leidner v. Napolitano, 2010 WL 5300533, *22 (E.D. Ky. Nov. 23, 2010)(citing Mickey v. Zeidler Tool and Die Co., 516 F.3d 516, 525 (6th Cir. 2008)).

First, Plaintiff's suspension seven months after he filed his EEOC charge and 15 months after he reported the harassment – the adverse actions he alleges in his amended complaint -- cannot support an inference of causation via temporal proximity. The suspension did not occur close in time to Plaintiff's reports of a racial hostile work environment with GE or his filing of

13

the EEOC charge. See Frankenberg v. Potter, 2009 WL 773502 (W.D. Ky. March 23, 2009). Interestingly, in response to the motion for summary judgment, Gaines argues that he received the four-week suspension for allegedly smoking on campus, the exact same month that he filed the instant lawsuit against GE, which raises the inference that the adverse employment action, the suspension, was based upon the exercise of his statutorily protected rights. The difficulty with this argument is the fact that GE suspended Gaines on July 23, 2015, but Gaines' lawsuit was not filed until July 29, 2015 – six days after GE suspended him. Therefore, Gaines has provided no evidence that he engaged in any protected activity close in time to his suspension.

Second, GE did not treat Gaines differently from similarly situated individuals. The record reflects that he and Beth Beedy, a Caucasian co-worker, were disciplined after the two were found smoking in a hazardous area during a non-break time. Gaines concedes that the co-worker received the exact same discipline he did and has provided no evidence that the co-worker had engaged in any protected activity. Furthermore, the Court finds that Gaines has failed to demonstrate that two other Caucasian employees, Roger Carver and Mary Doak, whom Gaines claims were disciplined less severely for smoking on GE's campus were similarly situated. In a discrimination case, the Sixth Circuit has explained that "[i]n order for . . . employees to be considered similarly-situated . . . the plaintiff must prove that all of the relevant aspects of his employment situation are 'nearly identical' to those of the [non-protected] employees who he alleges were treated more favorably." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994). See also Knox v. Neaton Auto Prods. Mfg., Inc., 375 F.3d 451, 458 (6th Cir. 2004). In making this determination, courts assess certain factors, such as whether the comparable employees "have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or

mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." MacDonald–Bass v. J.E. Johnson Contracting, Inc., 493 Fed. Appx. 718, 724 (6th Cir. 2012)(quoting Noble v. Brinker Int'l, Inc., 391 F.3d 715, 729 (6th Cir. 2004) (citation omitted)). The Sixth Circuit recognizes that these factors listed above are not rigid requirements, but "are only apposite where they are meaningful to the particular claim of discrimination presented." Bobo v. United Parcel Service, Inc., 665 F.3d 741, 751 (6th Cir. 2012). Here, Gaines testified that Carver and Doak were disciplined for violating GE's prohibition of smoking on its campus. Gaines offered no evidence that Carver and Doak engaged in the same conduct as Gaines which was smoking in a hazardous area during a non-break time or dealt with the same supervisor. In fact, Gaines acknowledged that Carver was on his lunch break when he was observed smoking. Plaintiff fails to produce any other evidence to establish causation.

Accordingly, the Court finds that Plaintiff has not stated a *prima facie* case of retaliation, and therefore summary judgment is appropriate

### C. Intentional Infliction of Emotional Distress

Defendant Cherrie Webb argues that Plaintiff cannot meet the high standard necessary to prevail on an intentional infliction of emotional distress ("IIED") claim. In Kentucky, a claim for intentional infliction of emotional distress is also known as the tort of outrage. Humana of Kentucky, Inc. v. Seitz, 796 S.W.2d 1, 3 (Ky. 1990). To prevail on a claim of intentional infliction of emotional distress, or outrage, a plaintiff must show that: (1) the defendant's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there is a causal connection between the conduct and the plaintiff's emotional distress; and (4) the emotional distress suffered by the plaintiff is severe. Gilbert v. Barkes, 987 S.W.2d 772, 777 (Ky. 1999); Kroger Co. v. Willgruber, 920 S.W.2d 61 (Ky. 1996).

Here, Gaines offers no expert proof on the degree of any emotional harm. See, e.g., MacGlashan v. ABS Lincs KY, Inc., 84 F. Supp. 3d 595, 605 (W.D. Ky. 2015) (applying Osborne v. Keeney, 399 S.W.3d 1 (Ky. 2012) to IIED claim: "This Court joins the latter group in holding *Osborne*'s requirement for expert testimony is limited to NIED and intentional infliction of emotional distress claims."); see also, e.g., White v. Bourbon Cmty. Hosp., LLC, 2016 WL 208303, *9 (E.D. Ky. Jan. 15, 2016); J.B.F. v. Kentucky Dep't of Educ., 2016 WL 3167546, *18 (E.D. Ky. June 3, 2016); Puri v. Baugh, 2015 WL 3796346, *7 (W.D. Ky. June 18, 2015); Hume v. Quickway Transportation, Inc., 2016 WL 3349334, *11 (W.D. Ky. June 15, 2016); Osborne, 399 S.W.3d at 17–18 ("Distress that does not significantly affect the plaintiffs everyday life or require significant treatment will not suffice.  And a plaintiff claiming emotional distress damages must present expert medical or scientific proof to support the claimed injury or impairment."); Stanley v. Trover, 2016 WL 99790 (Ky. App. Jan. 8, 2016).  Accordingly, the failure to present sufficient affirmative evidence in the form of expert or scientific proof concerning any severe emotional distress is thus fatal to Gaines' IIED claim, and summary judgment is granted.

## IV.  CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that the motions by Defendants, General Electric Company and Cherrie Webb, for summary judgment [DN 40, DN 41] are **GRANTED**.  A judgment shall be entered consistent with this opinion.

Joseph H. McKinley, Jr., Chief Judge
United States District Court

cc: counsel of record

February 10, 2017